**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:25-cv-25095-PCH**

ALLY STEDMAN,

                Plaintiff,

vs.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

              Defendant.

_____/

**MEMORANDUM IN SUPPORT OF EXPEDITED MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Gregory Bloom
ChaseLawyers
21 SE 1st Avenue, Suite 700
Miami, Florida 33131
Telephone: (305) 373-7665
Facsimile: (305) 373-7668
Email: greg@chaselawyers.com

*Attorney for Plaintiff
Ally Stedman*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT…………………………………………………………..1

FACTS ………..…………………………………………………………………………… 3

      I.      NCAA Bylaws and Eligibility………....…………………………………… 3
      II.     Plaintiff's Collegiate Background……………..……………………………4

LEGAL ARGUMENT ………………………………………………………………...9

A. Plaintiff Has A Substantial Likelihood Of Success On Her Sherman Act Claim …………………..……………………………………………………... …..11

     i.      United States Labor Market For College Athletes, In This Case Women's College Basketball, Is The "Relevant Market"…………………………………..……12

     ii.     The NCAA's Eligibility Rules Constitute an Unreasonable Restraint of Trade……13

     iii.    The NCAA Cannot Demonstrate Any Legitimate Procompetitive Justification…...15

     iv.    NCAA's Objectives Can Be Achieved Through Less Restrictive Means………….17

B. Plaintiff Will Suffer Irreparable Harm In The Absence of The Requested Temporary Restraining Order and Preliminary Injunction…………...……………………………19

C. The Balance of Equities…………………………………………………………..20

D. Injunctive Relief Serves the Public Interest of Promoting Free and Fair Competition in Labor Markets……………………………………………………………………...22

CONCLUSION…………………………………………………………………23

CERTIFICATE OF SERVICE……………………………...…………………………..24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531, 544 (1987)...........................................................................................10

*Brooks v. State Coll. Area Sch. Dist.,*
643 F. Supp. 3d 499, 510 (M.D. Pa. 2022)................................................................20

*City of Los Angeles v. Lyons,*
461 U.S. 95, 107 n.8 (1983),.................................................................................10, 19

*Earth Island Inst. V. Carlton ,*
626 F.3d 462, 469 (9th Cir. 2010) ...............................................................................9

*Elad v. Nat'l Collegiate Athletic Ass'n,*
2025 WL 1202014 (D.N.J. Apr. 25, 2025),............................................................…...2

*Fourqurean v. Nat'l Collegiate Althletic Ass'n,*
2025 WL 993975 (M.D. Tenn. 2025),.....................................................................…. 13

*Ho-Ho-Kus, Inc. v. Sucharski,*
No. 2:23-cv-01677, 2023 U.S. Dist. LEXIS 201393 (D.N.J. Nov. 9, 2023). ...............10

*In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.,*
375 F. Supp. 3d 1058, 1070 (N.D. Cal. 2019) ......................................................13,16

*Johnson v. Nat'l Collegiate Athletic Ass'n,*
No. 12-1223 (3d Cir. July 11, 2024) ..........................................................................15

*Nat'l Collegiate Athletic Ass'n v. Alston,*
594 U.S. 69  (2021) .......................................................................................... *passim*

*Nat'l Collegiate Athletic Ass'n v. Board of Regents,*
468 U.S. 85, 98 (1984)................................................................................................11

*Ohio v. American Express Co.,*
138 S. Ct. 2274 (2018)......................................................................................2, 11, 15

*Ohio v. Nat'l Collegiate Athletic Ass'n,*
706 F. Supp. 3d 583 (N.D.W. Va 2023) ...................................................... *passim*

*Pavia v. Nat'l Collegiate Athletic Ass'n,*
760 F. Supp. 3d 527 (M.D. Tenn. 2024)...................................................... *passim*

*S.A. v. Sioux Falls Sch. Dist.,*
49-5, 2023 WL 6794207, at *9 (D.S.D. Oct. 13, 2023)................................................................20

*Schrader v. Bailey,*
74 F. 4th 120, 126 (3d Cir. 2024) .............................................................................................22

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
240 F. 3d 832, 839 n.7 (9th Cir. 2001) .......................................................................................9

*Texaco Inc. v. Dagher,*
547 U.S. 1, 5 (2006)....................................................................................................................11

*United States v. E.I. du Pont de Nemours & Co.,*
351 U.S. 377, 395 (1956)............................................................................................................12

*Williams v. Nat'l Collegiate Athletic Ass'n,*
2024 U.S. Dist. LEXIS 18479, AT *7-8 (S.D. Ohio 2024) .............................................19, 21, 22

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7, 129 S.Ct. 365 (2008)...........................................................................................9, 10

**FEDERAL RULES**

Fed R. Civ. P. 65 ..........................................................................................................................9

**STATUTES**

15 U.S.C. § 1.................................................................................................................................11

## <u>PRELIMINARY STATEMENT</u>

Plaintiff, Ally Stedman ("Plaintiff" or "Stedman") respectfully submits this Memorandum of Law and Verified Complaint in support of her application for an Order to Show Cause with Temporary Restraints requiring Defendant, the National Collegiate Athletic Association (the "NCAA"), to show why the Court should not enter a temporary restraining order ("TRO") and a preliminary injunction enjoining the NCAA from enforcing eligibility rules (defined below) that violate both Federal and Florida antitrust laws and other applicable state laws that prevent Plaintiff from competing for a NCAA DI institution during the 2025-2026 women's basketball season.

Plaintiff, Ally Stedman, further seeks an order declaring that her 2023–2024 season be recognized as a season lost due to her verified medical and mental-health incapacity under Division I Bylaw 12.6.4, and that the hardship-redshirt waiver she sought, supported by the medical records and written opinion of the University of Miami's Director of Sport Psychology, should have been granted. The NCAA's failure to honor this verified hardship, and its subsequent delegation of such eligibility decisions to a head coach with no medical authority, deprived Plaintiff of the opportunity to properly recover and resulted in her being coercively compelled to compete against medical advice. As a result, Plaintiff was forced to continue to play the remainder of the season while declared mentally unfit, exhausting one of Plaintiff's four permissible seasons of competition and thus losing a full year within her five-year eligibility window.

The NCAA's conduct demonstrates a systemic problem in the way eligibility rules are applied and enforced. How the NCAA handles the approval (or denial) of hardship and waiver requests from athletes all with differentiating physical and mental health issues varies

1

significantly not only from school to school but from one NCAA division to another. In a clear violation of its own, self-created By-Laws, the NCAA has allowed coaches and athletic administrators, rather than qualified medical professionals, to frequently make decisions that directly affect athlete's eligibility and welfare. This broken structure enables coaches and teams with ulterior competitive or roster-management motives to pressure athletes into competing under unsafe conditions thereby overriding the professional opinions of the licensed clinicians actually empowered by the NCAA to make these decisions. These inconsistent and coercive practices, coupled with the NCAA's lack of uniform standards, place athletes in a position where the outcome of a waiver request depends more on a coach who makes the decision based on that team's needs rather than on the merits of the medical evidence put in place to protect the physical health and mental well-being of the student athlete.

The NCAA's inconsistent and arbitrary application of its waiver and eligibility rules is subject to judicial and antitrust review. The Supreme Court's decision in *NCAA v. Alston* and a growing body of related federal cases confirm that NCAA rules restricting athlete participation and compensation must be analyzed under the "rule of reason" and supported by valid procompetitive justifications. As articulated in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), the inquiry follows a three-step, burden-shifting approach. The plaintiff must first show that the challenged rule produces substantial anticompetitive effects within a properly defined market; if established, the burden shifts to the defendant to identify a valid procompetitive justification; and, if such a justification is offered, the plaintiff must then demonstrate that the same goals could be achieved through less restrictive or more efficient means. The NCAA's current eligibility system cannot meet that standard. Through its various amendments, waivers, and court-mandated exceptions, the NCAA has created multiple overlapping eligibility

frameworks that function as artificial restraints on competition within the college athletics marketplace.[1]

Absent a temporary restraining order and preliminary injunction, Plaintiff will continue to suffer immediate and irreparable harm, including the permanent loss of a season of NCAA Division I competition and eligibility, the inability to pursue lucrative Name, Image, and Likeness ("NIL") opportunities tied to active participation and further damage to her professional development and mental well-being. Despite the submission of a full medically supported Season-of-Competition Waiver and subsequent appeal based on properly verified documentation, the NCAA has provided no assurances that it will render a timely or favorable decision. Each week of inaction further erodes Plaintiff's eligibility, training opportunities, and ability to complete her collegiate career in a safe and competitive environment. In support of this Motion, Plaintiff relies solely upon this Verified Complaint, and the accompanying Brief in Support of Preliminary Injunction.

## **FACTS**

### I.     **NCAA Bylaws and Eligibility**

The NCAA's Bylaws is a self-contained body of rules that collectively governs every aspect of athlete's eligibility, competition, and participation across its member institutions. These rules have the force and effect of a binding contract among all Division I members, who have agreed to adhere to and enforce the NCAA's uniform eligibility restrictions as a condition of membership. *See,* Verified Complaint ¶ 31.

---

[1] *See* Nat'l Collegiate Athletic Ass'n v. Alston, 594 U.S. 69 (2021); Ohio v. Nat'l Collegiate Athletic Ass'n, 706 F. Supp. 3d 583 (N.D.W. Va. 2023); Pavia v. Nat'l Collegiate Athletic Ass'n, 760 F. Supp. 3d 527 (M.D. Tenn. 2024); and Elad v. Nat'l Collegiate Athletic Ass'n, 2025 WL 1202014 (D.N.J. Apr. 25, 2025).

Among the most significant of these restrictions are Bylaw 12.6 the "Four-Seasons Rule" and Bylaw 12.6.1 the "Five-Year Rule", which together limit each athlete to four seasons of intercollegiate competition within a five-year period following initial collegiate enrollment. Additionally, Bylaw 12.6.4 provides that a student-athlete may qualify for a medical-hardship waiver when the athlete has participated in fewer than thirty percent (30%) of scheduled contests and becomes unable to continue due to an incapacitating injury or illness occurring before the midpoint of the season. Similarly, Bylaw 12.6.1.7.1.1(a) recognizes "incapacitating physical or mental circumstances" supported by contemporaneous medical documentation as an approvable grounds for a waiver of the five-year limit. *See,* Verified Complaint ¶ 32.

## II.   Plaintiff's Collegiate Background

Plaintiff played her freshman year at Pepperdine University during the 2021-2022 season (the "Freshman Season") and immediately became a key contributor for the women's basketball team, distinguishing herself as one of the top guards in her conference. During the Freshman Season, Plaintiff played in 24 of 25 games, logging over 750 total minutes, and ranked among the team leaders in scoring. *See,* Verified Complaint ¶ 7.

During her sophomore season (2022–2023), Plaintiff again held a starting role and was having an extremely productive season before suffering a partial lateral meniscus tear midway through the season. Despite the injury, she continued to compete for several weeks at the request of her coaches before medical staff determined that surgical intervention was necessary. *See,* Verified Complaint ¶ 40. After the season, Pepperdine University hired a new head coach, changing the structure and culture of the program. Facing uncertainty about her recovery timeline and future playing opportunities, Plaintiff entered the NCAA transfer portal seeking a new and

upgraded environment to continue her flourishing career at an institution that would be a better fit for her rehabilitation and athletic goals. *See,* Verified Complaint ¶ 8.

Once entering the transfer portal, Plaintiff was heavily recruited by University of Miami ("UM") Head Coach Katie Meier ("Meier") during the spring of 2023. *See,* Verified Complaint ¶ 10. UM presented itself as an elite program capable of developing Plaintiff into an All-Conference and professional-caliber athlete. During the recruitment process, Meier assured Plaintiff that she was comparable to All-American players, that she would play extensive minutes during the season and that UM would provide her with the exposure necessary to be scouted by WNBA teams. Based on those representations, Plaintiff transferred to UM for the 2023–2024 academic year. *See,* Verified Complaint ¶¶ 11, 12.

Unfortunately, shortly after the beginning of the new season, Plaintiff was facing the disappointment of not receiving any of what was promised to her by Meier which initially convinced Plaintiff to transfer. Plaintiff was not given the opportunities previously promised, as she was not playing any significant minutes, was not being introduced to any WNBA scouts and was not being groomed to be an all-conference athlete. These circumstances led to mounting mental and emotional distress, including anxiety, loss of confidence, and further isolation. In August 2023, during the team's foreign pre-season tour to Greece and Paris ("Pre-Season Tour"), due to lack of promised playing time, relegation to a low-end bench player and constant mistreatment from her teammates, Plaintiff's mental and emotional health began to deteriorate sharply. What began as minor panic attacks quickly escalated into severe anxiety, dissociation, insomnia, and a profound loss of motivation and confidence. Having always been highly driven and passionate about basketball, she found the sudden emotional detachment from the sport she loved deeply painful and confusing. *See,* Verified Complaint ¶ 13.

During the Pre-Season Tour, Assistant Coach "Fitz" made bets with other players that Plaintiff would fail an upcoming fitness test scheduled for later in the preseason.  These comments, made publicly, were deeply humiliating and reinforced Plaintiff's growing self-doubt.  After returning from the trip, Plaintiff's symptoms intensified. She experienced persistent insomnia, social withdrawal, and depressive fatigue that made it difficult to attend class or complete team obligations.  Her family became so concerned that they traveled to Miami from their home in Arizona to check on her well-being, recognizing that she was no longer functioning as she normally had in the past. *See,* Verified Complaint ¶ 13.

On or about September 1, 2023, more than two months before the start of the competitive season, Plaintiff began regular psychotherapy sessions with Dr. Eric Goldstein, UM's Director of Sport Psychology and Mental Health ("Dr. Goldstein").  Her treatment initially focused on coping strategies, relaxation techniques, and cognitive restructuring to manage her stress. Dr. Goldstein noted significant anxiety, sleep disturbance, and low mood consistent with a developing depressive disorder.  According to NCAA's "Mental Health best Practices," transition in or from sport, including but not limited to injury, transfer, being cut from a team and/or graduation, can increase risk for psychological distress among collegiate athletes. *See,* Verified Complaint ¶¶ 17, 18 Ex. A, B.

In addition to her mounting mental and emotional distress, Plaintiff suffered a broken pinky finger on her shooting hand in early October, forcing her to sit out for approximately three to four weeks during team scrimmages.  Upon returning, Plaintiff expressed to Meier that the combination of her deteriorating mental health and lingering physical injuries to her knee and finger had left her unprepared for the upcoming season.  Meier, however, remained dismissive of Plaintiff's

concerns and failed to provide any meaningful support, accommodation or assistance to Plaintiff. *See,* Verified Complaint ¶ 19.

On or about November 24, 2023, after nearly three (3) months of ongoing psychological treatment and consistent physical therapy, and well in advance of the thirty percent (30%) contest marker to acquire a medical redshirt under NCAA guidelines, Dr. Goldstein raised the possibility to Plaintiff of redshirting for the remainder of the season.  Dr. Goldstein had documented that Plaintiff was suffering from Adjustment Disorder with Anxiety and Depression and Major Depressive Disorder.  After reviewing these factors, Dr. Goldstein concluded that redshirting was medically appropriate and in Plaintiff's best interest to protect her mental health and allow for stabilization before resuming competition. He expressed support for the plan and stated in text messages that he did not see why Meier would deny Plaintiff a redshirt if requested. *See,* Verified Complaint ¶ 20, Ex. C.

Plaintiff again discussed her difficulties returning from her physical injuries and presented Dr. Goldstein's mental health diagnosis to Meier, and formally requested to be redshirted, on or about November 24, 2023 (which was well within the NCAA's time frame for such a request according to its Bylaws) and Meier not only dismissed the Doctor's professional, medical recommendation, but told Plaintiff that she needed to "*toughen up, buttercup*" and refused to permit her to redshirt, stating that "the team needed her" and that "she was an important part of the roster".  In direct conflict of Dr. Goldstein's medical advice, Meier demanded that Plaintiff continue on with the team, further adding injury to Plaintiff's fragile mental state and continuing to aggravate her lingering physical injuries.  *See,* Verified Complaint ¶ 21.

Immediately thereafter, Plaintiff informed Dr. Goldstein that Meier had denied to further discuss her redshirt request. Dr. Goldstein, who was fully aware of her deteriorating mental and

emotional health, reiterated his support to Plaintiff and that a redshirt should be appropriate, however, he did not directly communicate with Meier regarding the matter. Instead, Dr. Goldstein continued Plaintiff's treatment but took no further action to challenge the decision or elevate the issue within the athletic department. Confused and upset by the actions of those who were supposed to assist her in this situation, and unaware of how to further enforce her rights under NCAA and institutional policy, Plaintiff felt helpless, and thus compelled to follow Meier's directive. Therefore, Plaintiff continued participating with the team despite her lingering physical ailments and mental health issues which continued to show worsening symptoms. *See,* Verified Complaint ¶ 22.

During this period, Plaintiff also observed increasingly chaotic team dynamics. In one instance, several teammates were involved in a public altercation that circulated widely on social media. Although, they were permitted to start the next game, UM staff later learned of the videos, arranged for their removal, and temporarily benched the players for the following contest. The environment worsened when a physical altercation occurred after practice between an assistant coach and a teammate. UM took steps to suppress the incident publicly and subsequently suspended the assistant coach, who was also Plaintiff's position coach, for the remainder of the season. The coach later resigned, and these events further contributed to Plaintiff's sense of instability and deteriorating mental health. *See,* Verified Complaint ¶ 24.

Plaintiff clearly met the criteria for a mental-health hardship waiver under NCAA Bylaw 12.6.4, which provides relief to athletes incapacitated for reasons beyond their control and supported by contemporaneous medical documentation. The records from Dr. Goldstein and the certified athletic trainer satisfied each requirement: (a) medically documented incapacity; (b) participation in less than thirty percent (30%) of the scheduled contests; and (c) onset of the

condition before the midpoint of the season.  Under normal application of the NCAA's hardship and medical-redshirt provisions, these circumstances would have preserved Plaintiff's season of competition and maintained her eligibility within the five-year window.

Instead, Meier refused to grant the redshirt request, disregarding the clinical recommendation from Dr. Goldstein and thereby overriding the medical judgment of licensed professionals who were supposed to be the final arbiter of such decisions.  Meier's self-imposed ruling, made without medical evaluation or consultation, deprived Plaintiff of the opportunity to qualify for the hardship exception and Meier ultimately forced Plaintiff to continue participating in practices and games while it had been clearly documented that she was medically unfit to compete. *See,* Verified Complaint ¶ 21

By midseason, Plaintiff was in clear crisis.  On one occasion, she begged to stay home because she could not stop crying and felt unsafe being around the team.  Despite this, UM still refused to grant her the requested redshirt or any medical relief regardless of the documentation provided by Dr. Goldstein.  As a result, Plaintiff was forced to further appear in twenty-two (22) games, in which her playing time was severely limited to a minor role player, even though she was continuously suffering from a clinically diagnosed mental illness that documented her as being unable to compete. *See,* Verified Complaint ¶ 41.

Following the 2023–2024 season, Plaintiff informed Meier that she intended to enter the NCAA transfer portal at the conclusion of the year. In response, Meier stated, "sorry it didn't work out for you" and as a parting shot, told Plaintiff that she "needed to work on [her] anxiety," thereby acknowledging the persistent mental-health struggles that had affected Plaintiff's well-being and athletic performance throughout the season.  This exchange confirmed that Plaintiff's difficulties at UM were not the result of a lack of effort or commitment, but of an environment that failed to

accommodate her documented mental-health condition as well as her physical injuries. *See,* Verified Complaint ¶ 25.

Plaintiff was then recruited by and transferred to UCF. While at UCF, she re-established herself as a starting guard and team captain.  Unfortunately, the environment at UCF soon deteriorated due to multiple internal team conflicts, including several physical altercations between teammates, none of which included Plaintiff.  However, after the assistant coach who had recruited Plaintiff resigned before conference play, rather than replace the coach with a qualified substitute, teammates parents began assisting in personnel and playing-time decisions. Plaintiff's minutes declined significantly thereafter, and the resulting instability led one of the team's top players to quit mid-season. *See,* Verified Complaint ¶ 27.

As a result of the current climate at UCF, Plaintiff, was encouraged by family members to enter the transfer portal at the conclusion of the 2024–2025 academic year, and once more to find a university and environment that would better support her in completing her collegiate career. Plaintiff has since transferred to Utah Valley University ("UVU"). UVU's coaching and compliance staff, after reviewing her medical and academic history, immediately recognized that the 2023–2024 season at UM should have been preserved under the NCAA's hardship and five-year waiver criteria, given the contemporaneous documentation from UM's own licensed clinicians. *See,* Verified Complaint ¶¶ 28, 29.

In July 2025, UVU submitted a Season-of-Competition Waiver (Case No. 1247882) on Plaintiff's behalf to the NCAA's Committee on Student-Athlete Reinstatement, supported by previous medical documentation, therapy records, and corroborating witness statements. These materials included: (a) psychological evaluations and treatment records from Dr. Goldstein, confirming diagnoses of Major Depressive Disorder (F32.1) and Adjustment Disorder with

Anxiety and Depression (F43.2**)**; (b) a supporting statement from UM's athletic trainer, Mr. Silver Harris ("Harris"), documenting Plaintiff's ongoing distress and medical unfitness during the 2023–2024 season; and (c) a statement from her teammate and roommate, Jaida Patrick ("Patrick"), describing Plaintiff's visible deterioration, emotional breakdowns, and repeated requests for relief that were ignored by Meier and UM's coaching staff. *See,* Verified Complaint ¶ 29.

Despite this uncontroverted evidence, the NCAA denied both UVU and Plaintiff's waiver request, adopting that UM's initial determination that Plaintiff's participation in twenty-six (26) games reflected "voluntary competition.", while totally disregarding its own Bylaws**,** which expressly recognize incapacitating physical or mental circumstances as valid grounds for a waiver, and instead deferred to the non-medical judgment of Meier whose decision had caused the harm in the first place. *See,* Verified Complaint ¶ 30.

## LEGAL ARGUMENT

Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders ("TROs"). The standard for issuing a TRO is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "An injunction is a matter of 'equitable discretion' and constitutes an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365 (2008)). To qualify for a preliminary injunction or TRO, a plaintiff must demonstrate (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; (4) and that the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 20, 129 S. Ct. 365.

The moving party bears the burden of establishing the first two elements likelihood of success and irreparable harm as threshold showings. *Ho-Ho-Kus, Inc. v. Sucharski*, No. 2:23-cv-01677, 2023 U.S. Dist. LEXIS 201393, at *46–47 (D.N.J. Nov. 9, 2023)*.  If these gateway factors are met, the court must then consider the remaining two elements and determine, in its discretion, whether the totality of circumstances warrants preliminary relief.  *Id*.  To obtain relief, Plaintiff need not prove certainty of success, but must demonstrate a clear likelihood that he/she will prevail on his/her underlying claims.  *Winter* established that a mere "possibility" of success is insufficient.  *Winter*, 555 U.S. at 22.  Similarly, irreparable harm must be likely, not speculative or hypothetical, and must reflect a "real and immediate threat of future injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).

Once likelihood of success and irreparable harm are established, courts then evaluate whether the balance of equities and public interest support an injunction. The equities analysis weighs the concrete harm the plaintiff faces without relief against any burden the injunction would impose on the defendant. The public interest analysis considers whether granting an injunction would advance or undermine important policy concerns.  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 544 (1987).  In *Winter*, the Supreme Court emphasized that these factors must be balanced together, and that an injunction should issue only when all four collectively favor the moving party.  *Id.*

As demonstrated below, all four elements weigh heavily in favor of granting a preliminary injunction to Plaintiff, whose case presents a clear violation of federal and state antitrust law and ongoing irreparable harm through the NCAA's arbitrary and coercive enforcement of its self-imposed eligibility rules.

**A. Plaintiff Has a Substantial Likelihood of Success of the Merits on Her Sherman Act Claim**

The Sherman Antitrust Act, 15 U.S.C. § 1, prohibits contracts, combinations, or conspiracies that restrain trade or commerce among the several states. While its language is broad, the Supreme Court has long interpreted the statute to bar only those restraints that are unreasonable or unduly restrictive of competition. *NCAA v. Board of Regents*, 468 U.S. 85, 98 (1984); *Ohio v. American Express Co.*, 585 U.S. 529, 540 (2018).  To determine whether a challenged rule or agreement constitutes such an unreasonable restraint, courts generally apply the "rule of reason" standard. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  Under this analytical framework, courts undertake a fact-intensive inquiry into the structure of the relevant market, the nature of the restraint, and its actual impact on competition.  *Am. Express Co.*, 585 U.S. at 541.

This inquiry follows a well-established three-step, burden-shifting approach. First, the plaintiff bears the initial burden of showing that the challenged restraint has a substantial anticompetitive effect within a properly defined market. If that burden is met, the defendant must then articulate a legitimate procompetitive justification for the restraint.  Should the defendant make such a showing, the burden shifts back to the plaintiff to prove that the same objectives could be achieved through less restrictive or more efficient means. *Id.*

Here, Plaintiff's hardship-redshirt waiver was denied despite verified medical documentation and the professional recommendation of Dr. Goldstein.  The NCAA's delegation of eligibility decisions to non-medical staff, including coaching personnel with competing interests, resulted in Plaintiff being coerced to compete against medical advice.  This inconsistent and arbitrary administration of waiver requests not only is a breach of Defendant's own By-Laws, but bears no legitimate procompetitive justification and operates as a commercial restraint that restricts the supply of athlete services within the collegiate sports market.

13

The NCAA's practices mirror those previously condemned in *Alston* and *Pavia*, where the courts held that eligibility rules directly affecting compensation and market participation are commercial in nature and must withstand antitrust scrutiny. Plaintiff is therefore likely to succeed on the merits of her claim that the NCAA's conduct violates Section 1 of the Sherman Act by unlawfully restraining trade and suppressing athlete economic mobility.

> **i.** **Unites States labor market for college athletes, in this case women's college basketball, is the "relevant market."**

A viable claim under Section 1 of the Sherman Act requires the plaintiff to identify the scope of both the product and geographic markets and to show that the defendant maintains control or dominance in those markets. *Am. Express Co.*, 542-44. The relevant product market consists of those goods or services that are reasonably interchangeable for the same purpose. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956).

Federal courts analyzing antitrust challenges to NCAA bylaws have repeatedly concluded that the NCAA and its member institutions operate with exclusive control over Division I athletics. As the *Ohio* court observed, the NCAA and its members collectively possess "the sole ability to dictate rules and regulations for participation in Division I athletics." *Ohio v. NCAA*, 706 F. Supp. 3d 583, 592 (S.D. Ohio 2023). Because no comparable alternatives exist for elite collegiate competition, the NCAA and its member schools effectively maintain the power to restrict or condition student-athlete participation and compensation at will, without facing meaningful market competition. *See, In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1070 (N.D. Cal. 2019).

Courts have therefore recognized the nationwide labor market for NCAA athletes, whether in football, basketball, or other Division I athletics, as the relevant market for antitrust purposes. *Pavia v. NCAA*, 760 F. Supp. 3d 527, 539 (M.D. Tenn. 2024); *see also*, *NCAA v. Alston*, 594 U.S.

69, 90 (2021) (acknowledging the NCAA's monopsony power "in the market for student-athlete services"); *Ohio*, 706 F. Supp. 3d at 592 (finding "the labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets"). Within this market, the NCAA's centralized authority enables it to impose and enforce eligibility rules that directly affect athletes' ability to compete, earn compensation, and market their athletic services.

> ### ii.     The NCAA's Eligibility Rules Constitute an Unreasonable Restraint of Trade

Plaintiff can establish, through both direct and indirect evidence, that the NCAA's eligibility restrictions restrain competition and cause widespread harm within the national labor market for Division I college athletes. *Pavia v. NCAA*, 760 F. Supp. 3d 527, 539 (M.D. Tenn. 2024). As the Supreme Court has already recognized, the NCAA itself "accepts that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition." *NCAA v. Alston*, 594 U.S. 69, 90 (2021) (emphasis in original). Subsequent courts have built upon that holding. In *Fourqurean v. NCAA*, 2025 WL 993975, at *4 (M.D. Tenn. 2025)*, the court concluded that eligibility limitations such as the Five-Year Rule excluded athletes from "the rapidly growing pie of NIL compensation," illustrating that restrictions on who may compete and for how long directly suppress output and earnings in a commercial market.

Given the NCAA's absolute control over Division I participation and the lack of any substitute marketplace for elite collegiate competition, the anticompetitive effects of these restrictions are inherent. The Four-Seasons, Five-Year, and Hardship-Redshirt Rules together function as a coordinated restraint among NCAA member institutions, horizontal competitors in the same market, who collectively agree to cap the supply of athletic labor. *Ohio v. NCAA*, 706 F. Supp. 3d 583, 591 (S.D. Ohio 2023). These rules do not merely limit individual players; they

define the very boundaries of opportunity for every athlete subject to NCAA authority, dictating who may sell their services, for how long, and under what circumstances.

The anticompetitive impact is compounded by the NCAA's inconsistent administration of its waiver process. While the bylaws clearly provide for hardship or medical redshirt exceptions, in practice those determinations have often rested in the hands of non-medical coaching staff or athletic administrators whose competitive incentives run directly counter to said university's appointed clinicians and their specific medical judgment. This inconsistent approach allows schools to treat similarly situated athletes differently based on subjective preferences or competitive pressures rather than clinical documentation or equitable standards. The result is a coercive system in which athletes, fearing loss of scholarship, roster position, or professional opportunity, are compelled to play through documented injuries or mental-health conditions rather than invoke protections theoretically guaranteed by the NCAA's own rules.

Plaintiff's experience exemplifies this systemic defect. Despite being diagnosed by Dr. Goldstein with anxiety and depression that clearly and conclusively warranted a mental-health redshirt, her request was denied at the coaching level, contrary to medical evidence and NCAA's own policy. This denial compelled her to compete at an insignificant level, while clinically unfit, costing her a full year of eligibility and a season of potential NIL income. The NCAA's failure to remedy that decision or act timely on her appeal only deepened the exclusionary effect.

### iii. The NCAA Cannot Demonstrate Any Legitimate Procompetitive Justification

Once a plaintiff demonstrates that a restraint produces anticompetitive effects, the burden shifts to the defendant to identify a legitimate procompetitive rationale. *See, Am. Express Co*. at 541. If such a procompetitive rational is presented, the burden shifts back to the plaintiff to demonstrate whether those claimed efficiencies could be realized through less restrictive means.

16

*Id.*  In *Pavia*, the NCAA advanced a series of "procompetitive" explanations for its eligibility restrictions, claiming that they: (1) preserve intercollegiate athletics as a unique offering; (2) increase the number of students who compete in Division 1 athletics; (3) impose the quality of the student-athlete experience; and (4) foster better alignment between athletics and academics.

The court rejected those arguments, finding that even if these interests were legitimate, they could be achieved through narrower and less restrictive means.  *Id.* at 543.  Likewise, *Alston* made clear that general appeals to tradition or amateurism cannot immunize rules that suppress athlete participation and compensation.  Several courts since *Alston* have held that NCAA limits were "patently more restrictive than necessary" to achieve any asserted objective. *See, e.g., Johnson v. NCAA*, No. 12-1223 (3d Cir. July 11, 2024) ("the Supreme Court in *Alston* noted that the NCAA had 'not adopted any consistent definition' of amateurism and acknowledged that the organization's 'rules and restrictions on compensation have shifted markedly over time,' which further undermined the NCAA's reliance on the concept"); *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1071 (N.D. Cal. 2019) (quoting former SEC Commissioner's testimony that he has "never been clear on . . . what is really meant by amateurism"); *State of Ohio v. NCAA*, 706 F. Supp. 3d 583, 595 (S.D. Ohio 2023) ("the NCAA has not even defined the nature of 'amateurism,' nor is it meaningfully defined within the organization's own constitution. Like the California district court, this Court cannot ascertain any coherent definition of this term, and apparently, it is not alone in this exercise").

Here, the NCAA is expected to claim that its eligibility restrictions and waiver procedures are designed to protect the health, safety, and educational experience of student-athletes while preserving competitive balance.  The NCAA's hardship and mental-health waiver rules, as applied to Plaintiff, do not advance education or competitive equity.  Instead, they empower institutional

actors to make medically uninformed decisions that directly harm athlete welfare.  During the 2023–2024 season, Dr. Goldstein, diagnosed Plaintiff with major depressive disorder and anxiety and advised that she should redshirt for medical reasons.  Despite this professional recommendation, Meier denied this request, compelled Plaintiff to continue competing (albeit in a very de minimis fashion), and thereby consumed one of her limited seasons of eligibility. These actions ignored clear medical documentation, disregarded the NCAA's own mental-health guidelines and left the athlete with no recourse other than to play through a verified condition that worsened with continued participation.

This type of process does not promote student development or fair competition.  Quite the opposite, it exposes a system in which eligibility decisions are influenced by competitive pressures rather than athlete's health, turning the NCAA's stated values into pretexts for control.  When a governing body allows coaches to override licensed clinicians, the result is not academic progress but coerced participation that damages both the athlete and the integrity of the competition.  This pattern has repeated across Division I institutions, where similar hardship waivers have been denied or delayed under inconsistent standards that depend more on institutional preference than medical evidence.

### iv.    NCAA's Objectives Can Be Achieved Through Less Restrictive Means

Even assuming the NCAA's stated goals of protecting education, health, and competitive balance are legitimate, its enforcement methods are unnecessarily restrictive and internally inconsistent.  The organization already maintains procedures intended to safeguard athletes facing medical or mental-health hardship, yet those procedures are applied arbitrarily and often delegated to coaching staff with no medical expertise.  As a result, outcomes depend more on institutional preference than on athlete welfare, undermining the very objectives the NCAA claims to promote.

18

As suggested in *Pavia*, it has already recognized that the NCAA can preserve its procompetitive aims through simpler, fairer adjustments. *Pavia*, 760 F. Supp. 3d at 543. Rather than empowering individual programs to decide who qualifies for relief, the NCAA could adopt a transparent, medically grounded hardship-redshirt process guided by independent medical and mental-health professionals. This approach would ensure decisions are consistent, evidence-based, and aligned with the NCAA's own Mental Health Best Practices.

The NCAA could also revise its participation limits to allow athletes to compete in up to five full seasons within the existing five-year eligibility window. Such an approach would accommodate legitimate medical or psychological interruptions while maintaining academic progress and competitive equity. These reforms would not alter the nature of intercollegiate athletics, they would simply bring consistent eligibility standards across institutions and divisions while promoting athlete safety and fairness.

Plaintiff's experience illustrates why these less restrictive alternatives are necessary. Despite a documented diagnosis of major depressive disorder and anxiety and a written recommendation from her treating psychologist, Meier denied Stedman's request for a medical redshirt and forced her to compete. This decision, made without taking into account any of the previously provided medical input, not only consumed a viable year of eligibility, worsened her mental health condition, and deprived Plaintiff of future NIL and professional opportunities to earn within an already limited window. A transparent, independent process would have prevented this harm and preserved both the athlete's health and her eligibility.

The NCAA's refusal to implement uniform, medically guided standards demonstrates that its restrictions are not narrowly tailored to its stated goals. The current system neither protects education nor promotes competitive balance; it enables arbitrary, coercive outcomes that penalize

athletes for seeking recovery.  Under the rule of reason, the existence of these readily available, less restrictive alternatives confirms that the NCAA's eligibility framework imposes an unreasonable restraint on competition in the market for college athlete services.  Accordingly, because Plaintiff can demonstrate that any purported procompetitive efficiencies associated with the NCAA's hardship-redshirt and waiver framework can be achieved through less restrictive, and more consistent means, those rules cannot withstand scrutiny under the rule of reason.  Plaintiff is therefore likely to succeed on the merits of her claim.

**B.  Plaintiff Will Suffer Irreparable Harm In The Absence of The Requested Temporary Restraining Order and Preliminary Injunction**

To obtain a preliminary injunction, a plaintiff must demonstrate that irreparable harm is likely, not merely possible, if relief is not granted. This standard requires a showing of "a real and immediate threat of future injury by the defendant." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). The harm must be concrete, imminent, and incapable of redress through later monetary relief.  Plaintiff will clearly suffer irreparable harm absent the requested temporary restraining order and preliminary injunction. If the NCAA is not enjoined from enforcing its current eligibility and waiver restrictions, Plaintiff will be unable to compete during the 2024–2025 season, thereby forfeiting her last remaining opportunity in her collegiate career. That loss cannot be undone through later relief or monetary compensation. As multiple courts have recognized, missing even a single game of NCAA competition constitutes irreparable harm because "it takes one throw, one catch, one shot, one block to make a student-athlete a household name across the nation." *Williams v. NCAA*, 2024 U.S. Dist. LEXIS 18479, at *7–8 (S.D. Ohio 2024) (quoting *Ohio v. NCAA*, 706 F. Supp. 3d 583, 594 (S.D. Ohio 2023)).

For Plaintiff, each game lost to an arbitrary eligibility restriction deprives Plaintiff of meaningful exposure, team development, and competitive momentum. Participation in Division I

basketball is not only a personal milestone but also the primary avenue for building NIL value and professional visibility. Courts have consistently held that college athletes "suffer irreparable harm when they are denied the opportunity to play sports," recognizing that money "cannot retroactively fix this harm." *S.A. v. Sioux Falls Sch. Dist. 49-5*, 2023 WL 6794207, at *9 (D.S.D. Oct. 13, 2023); *Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499, 510 (M.D. Pa. 2022). As in *Brooks*, missed opportunities "to practice and compete" qualify as irreparable harm because the experience, development, and exposure gained through athletic participation cannot be replaced or replicated later. Likewise, as *Sioux Falls* explained, "even if plaintiffs end up winning on the merits, without a preliminary injunction the plaintiffs will not be able to practice or compete in the upcoming gymnastics season set to begin October 30, 2023. Money cannot retroactively fix this harm, making it irreparable." *Id.* at *9–10*.

Moreover, Plaintiff's forced participation during the 2023–2024 season, despite a documented medical diagnosis and recommendation for a mental-health redshirt, caused her condition to deteriorate further. Now, being denied the opportunity to compete in what would be her final collegiate season, at a time when she has regained stability and is supported by a healthier environment, poses an equally serious and life-altering risk to her mental health. Courts have recognized that the absence of athletic participation can cause lasting emotional harm and identity loss. *Ohio v. NCAA*, 706 F. Supp. 3d 583, 599 (S.D. Ohio 2023) ("The absence of a student-athlete from competition may have life-altering impacts on mental health."). In Plaintiff's case, exclusion from the upcoming season would undo her psychological progress, isolate her from the community that supports her recovery, and directly undermine the NCAA's stated mission to protect the health, safety, and educational development of student-athletes.

### C. The Balance of Equities

The equities in this case weigh decisively in Plaintiff's favor. Without immediate injunctive relief, she will continue to suffer concrete, irreparable harm, including the permanent loss of her final season of NCAA competition, her opportunity to compete at the highest collegiate level, and the accompanying educational, developmental, and NIL benefits. By contrast, the NCAA will experience little to no harm if Plaintiff is temporarily permitted to participate in practices and competition while this case proceeds on the merits. Should the NCAA ultimately prevail, it may later reinstate its eligibility determinations without any lasting prejudice.

In *Williams* 2024 U.S. Dist. LEXIS 18479, at *8, the court found that the equities weighed in favor of the athlete, reasoning that he would face irreparable harm if barred from participating in Division I basketball, while "the NCAA would suffer little harm insofar as, should they later succeed on the merits, they can resume enforcement" of the disputed rule. Similarly, in *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *35, the court found that the balance favored the athlete where the relief sought, as here, would enable the collegiate athlete to "play next season while the case plays out." And in *Ohio*, 706 F. Supp. 3d 583, 600, the court held that preventing the NCAA from enforcing a single eligibility rule would cause "no harm to the NCAA" because it would "merely prevent enforcement of one of the NCAA's bylaws, allowing collegiate athletes to compete in athletic events already scheduled to take place.

Here, Plaintiff seeks only to preserve the status quo, to continue her collegiate career pending resolution of this matter, while the NCAA seeks to impose an irrevocable deprivation of eligibility that cannot later be undone. The requested injunction would not alter the NCAA's broader operations or financial interests; it would simply ensure that an athlete who went through the proper and necessary channels to obtain a medical redshirt yet was wrongfully denied relief is now

allowed to compete. Given that the NCAA routinely grants waivers for similar circumstances, temporary participation by Plaintiff would not disrupt competitive balance or administrative processes. Accordingly, the balance of equities overwhelmingly favors Plaintiff, as the harm she faces from continued exclusion far exceeds any speculative or procedural inconvenience to the NCAA.

### D. Injunctive Relief Serves the Public Interest of Promoting Free and Fair Competition in Labor Markets

The movant for injunctive relief must also demonstrate that it "serves the public interest." *Schrader v. Bailey*, 74 F.4th 120, 126 (3d Cir. 2024). Here, a TRO and preliminary injunction would serve the public interest by advancing the principles underlying the antitrust laws, namely, promoting free and fair competition in labor markets. As multiple courts have recognized, "Free and fair competition in labor markets is essential to the American economy" and "[p]rotecting competition in the labor market for NCAA Division I student-athletes serves the public's interest in free and fair competition in labor markets." *Ohio*, 706 F. Supp. 3d at 600; accord *Williams*, 2024 U.S. Dist. LEXIS 18479, at *8; Tennessee v. NCAA*, 718 F. Supp. 3d 756, 766 (E.D. Tenn. 2024); see also *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *35*.

Granting relief here would not only protect but actively promote fair competition by ensuring that eligibility decisions are consistent, medically based and free from institutional bias. Plaintiff's exclusion under the NCAA's arbitrary waiver process deprives both her and her team of a qualified, healthy competitor who has worked diligently to restore her academic standing and mental well-being. Allowing Plaintiff to compete in the 2025–2026 season would reinforce the integrity of NCAA athletics by ensuring that athletes are able to perform physically, mentally, and emotionally at their best, thereby elevating the overall quality of competition and fairness across the sport.

This relief reinforces the NCAA's own publicly stated commitment to prioritizing student-athlete health and welfare. When eligibility determinations reflect clinical judgment rather than administrative inconsistency, the public can trust that collegiate athletics operates under transparent and principled standards. That trust is essential not only for the athletes but also for fans, institutions and future competitors who rely on the fairness of NCAA regulation. By contrast, denying injunctive relief would erode that confidence, signaling that medical recommendations and athlete welfare are secondary to coercive control. Such a result would harm not only Plaintiff but also the broader public interest in maintaining integrity, health, and genuine competition within collegiate sports. Accordingly, the public interest strongly supports the issuance of a temporary restraining order and preliminary injunction.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant his request for a temporary restraining order and preliminary injunction.

Dated: November 5, 2025                             Respectfully submitted,

                                                    CHASELAWYERS

                                                    _  /s/ Gregory  Bloom_
                                                    Gregory Bloom, Esq.
                                                    ChaseLawyers
                                                    21 SE 1st Avenue, Suite 700, Miami,
                                                    Florida, 33131
                                                    Telephone: (305) 373-7665
                                                    Facsimile: (305) 373-7668
                                                    Email: greg@chaselawyers.com

                                                    _Attorney for Plaintiff Ally Stedman_