IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-25095-PCH

ALLY STEDMAN,

              Plaintiff,

    v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

              Defendant.

---

## DEFENDANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION'S OPPOSITION TO PLAINTIFF ALLY STEDMAN'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

i

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 2

    I.     The NCAA and Its Eligibility Rules ................................................................. 2

    II.    Plaintiff Competed in Four Seasons of Competition Before Applying
         for a Waiver to Compete in a Fifth Season. ..................................................... 3

    III.   After Plaintiff's Waiver Request Is Denied, She Files Suit. ............................ 5

ARGUMENT ......................................................................................................................... 7

    I.     Legal Standard .................................................................................................. 7

    II.    Plaintiff Cannot Show a Likelihood of Success on the Merits. ........................ 7

         A.    The Plaintiff's Antitrust Claims Fail Because the Challenged
              Rules Are Not Subject to Antitrust Review.......................................... 7

         B.    Plaintiff Fails to Show a Likelihood of Success on the Merits
              Under the Rule of Reason.................................................................... 9

         C.    Plaintiff Has Not Suffered Antitrust Injury........................................ 17

    III.   Plaintiff Cannot Satisfy the Other Requirements for a Temporary
         Restraining Order or Preliminary Injunction................................................... 18

         A.    Plaintiff Will Not Suffer Immediate and Irreparable Harm. ............. 18

         B.    The Injunction Would Be Adverse to the Public Interest.................... 20

CONCLUSION ..................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*All Care Nursing Serv., Inc. v. High Tech Staffing Serv., Inc.*,
  135 F.3d 740 (11th Cir. 1998) ................................................................. 7

*Am. Express Co.*,
  505 U.S. ..................................................................................................... 14

*Andela v. Univ. of Miami*,
  692 F. Supp. 2d 1356 (S.D. Fla. 2010) ................................................... 32

*Arbolida v. NCAA*,
  No. 25-2079-JWB, 2025 WL 579830 (D. Kan. Feb. 21, 2025)........... 24, 33

*Bassett v. NCAA*,
  528 F.3d 426 (6th Cir. 2008) .................................................................. 13

*Bensiek v. Lamone*,
  585 U.S. 155 (2018).................................................................................. 33

*Bloedorn v. Grube*,
  631 F.3d 1218 (11th Cir. 2011) ............................................................... 7

*Boyd v. NCAA*,
  No. 3:25-CV-00729, 2025 WL 2432200 (M.D. Tenn. Aug. 22, 2025)................... 26

*Brooks v. State Coll.*,
  643 F. Supp. 3d 499 (M.D. Pa. 2022) ..................................................... 34

*Brunswick Corp. v. Pueblo Bowl-OMat, Inc.*,
  429 U.S. 477 (1977).................................................................................. 31

*Brzovic v. NCAA*,
  No. 2:25-cv-02885-DCN, 2025 WL 1370758 (D.S.C. May 11, 2025) ................... 11

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.*,
  No. 02-60772-CIV, 2004 WL 7340356 (S.D. Fla. Mar. 16, 2004) .......... 32

*Coley v. NCAA*,
  792 F. Supp. 3d 634 (E.D.N.C. 2025).................................................... 10

*Diaz v. Miami-Dade Cnty.*,
  424 F. Supp. 3d 1345 (S.D. Fla. 2019) .................................................... 7

iii

*Fourqurean v. NCAA*,
  143 F.4th 859 (7th Cir. 2025) ............................................................... 15, 20, 24, 26

*Freedom Watch Inc. v. Jud. Watch, Inc.*,
  289 F. Supp. 3d 1270 (S.D. Fla. 2018) ...................................................................... 9

*Gaines v. NCAA*,
  746 F. Supp. 738 (M.D. Tenn. 1990)........................................................................ 11

*Giles v. NCAA*,
  No. 2:25-CV-06454-JVS-KES, 2025 WL 2551093 (C.D. Cal. Aug. 18, 2025)...................... 10

*Goldstein v. NCAA*,
  No. 3:25-cv-27, 2025 WL 662809 (M.D. Ga., Feb. 28, 2025) ................................ 9, 12, 18, 19

*Hasz v. NCAA*,
  No. 8:25CV398, 2025 WL 2083853 (D. Neb. July 24, 2025)........................................ 10

*Hawaii v. Standard Oil Co.*,
  405 U.S. 251 (1972)................................................................................................ 35

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
  375 F. Supp. 3d 1058 (N.D. Cal. 2019) ...................................................................... 28

*Jacobs v. Temper-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) .................................................................... 17, 18, 22

*Johnson v. NCAA*,
  108 F.4th 163 (3d Cir. 2024) .................................................................................. 28

*Johnson v. NCAA*,
  No. 2:25-CV-01288, 2025 WL 3145866 (S.D. Oh. Nov. 11, 2025) .................... 24, 25, 30, 34

*Johnson v.* NCAA,
  No. CV 25-60-M-KLD, 2025 WL 1790345 (D. Mont. June 26, 2025)............................ 10, 27

*Jones v. NCAA*,
  392 F. Supp. 295 (D. Mass. 1975) .......................................................................... 11

*Klay v. United Healthgroup, Inc.*,
  376 F.3d 1092 (11th Cir. 2004) .............................................................................. 16

*L.H. Equity Invs. LLC v. Wade*,
  No. 09-80607-CIV, 2010 WL 11505176 (S.D. Fla. Mar. 29, 2010) ........................... 17

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
  72 F.3d 1538 (11th Cir. 1996) ................................................................................ 17

iv

*NCAA v. Alston*,
 594 U.S. 69 (2021) .......................................................................................................... passim

*O'Bannon v. NCAA*,
 802 F.3d 1049 (9th Cir. 2015) ................................................................................................ 12

*Ohio v. Am. Express Co.*,
 585 U.S. 529 (2018) ................................................................................................. 13, 15, 22

*Ohi*o v. NCAA—another case cited by Plaintiff—the court likewise found the relevant market to
 be sport-*spec*ific. See,
 706 F. Supp. 3d 583 (N.D. W.Va. Dec. 13, 2023) ......................................................... 21, 28, 34

*OM Group, Inc. v. Mooney*,
 No. 2:05-CV-546-FTM-22-SPC, 2006 WL 68791 (M.D. Fla. Jan. 11, 2006) ........................... 8

*Osuna Sanchez v. NCAA*,
 No. 3:25-cv-62-CEA-DCP, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025) .............................. 10

*Pittman v. Cole*,
 267 F.3d 1269 (11th Cir. 2001) ................................................................................................. 8

*Powers v. Health First, Inc.*,
 2023 WL 10947153 (M.D. Fla. Sep. 7, 2023) ..................................................................... 16, 17

*Pavia v. NCAA*,
 760 F. Supp. 3d 527 (M.D. Tenn. Dec. 18, 2024) ......................................................... 20, 21, 29

*Procaps S.A. v. Patheon, Inc.*,
 845 F.3d 1072 (11th Cir. 2016) ............................................................................................... 23

*Ragner Tech. Corp. Berardi*,
 No. 14-80734-CIV, 2015 WL 11393828 (S.D. Fla. June 12, 2015) ........................................ 23

*See*,
 2023 WL 6794207 (S.D. Oct. 13, 2023) .................................................................................. 34

*Siegel v. LePore*,
 234 F.3d 1163 (11th Cir. 2000) ........................................................................................... 8, 37

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
 376 F.3d 1065 (11th Cir. 2004) ......................................................................................... 22, 25

*Stenograph, LLC v. Advantage Software, Inc.*,
 No. 99-6685-CIV, 2006 WL 8433176 (S.D. Fla. Nov. 30, 2006) ........................................... 18

*Windsor v. United States*,
 379 F. App'x 912 (11th Cir. 2010) .......................................................................................... 33

4925-8467-3402

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ............................................................................................................ 7

*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
    388 F.3d 955 (6th Cir. 2004) ................................................................................... 9, 13

*Young v. Colonial Oil Co.*,
    451 F. Supp. 360 (M.D. Ga. 1978) ............................................................................ 35

*Zeigler v. NCAA*,
    No. 3:25-CV-226-KAC-JEM, 2025 WL 1671952 (E.D. Tenn. Jun. 12, 2025)............ 12, 25, 35

Statutes

15 U.S.C. § 1 ................................................................................................................ 6, 9, 15

15 U.S.C.A. § 15 .............................................................................................................. 35

Fla. Stat. § 542.18 ............................................................................................................ 6

Rules

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 16

## **INTRODUCTION**

This case is about NCAA eligibility rules that have long governed Division I athletics, and a plaintiff who seeks to rewrite them through antitrust litigation. For decades, member schools of the NCAA, a self-governing association of member colleges, universities, and athletic conferences, have established eligibility rules to preserve college athletics as a unique offering from professional sports and foster alignment between student athletics and degree progression. These rules encompass everything from minimum required academic standards to limitations on how long student-athletes may compete.

Relevant here, the NCAA's eligibility rules limit student-athletes to four seasons of competition (what Plaintiff refers to as the "Four-Seasons Rule"). Plaintiff—having already played four seasons of Division I basketball—requests this Court to use its equitable powers to grant her a fifth season. Specifically, she asks the Court to issue a mandatory injunction that enjoins the NCAA from enforcing the Four-Seasons Rule and/or related waiver provisions against her, arguing the rules do not require medical provider input in the way and at the time she believes appropriate.

On several independent grounds, Plaintiff's antitrust claims fail as a matter of law. First, the NCAA's season-of-competition limits are "true eligibility rules" beyond the reach of antitrust law. Numerous courts, including those faced with similar challenges, have rejected attempts to shoehorn the NCAA's eligibility limits into antitrust theory. Second, assuming an antitrust review is applicable, Plaintiff submits no evidence showing that the relevant bylaws have produced any anticompetitive effect or antitrust injury in a well-defined, relevant market (as required under a rule of reason analysis), nor has she made any showing that her proposed "less restrictive alternatives" would accomplish the NCAA's procompetitive objectives without undermining them.

Finally, Plaintiff fails to satisfy the other necessary criteria for injunctive relief. She has not

demonstrated immediate or irreparable harm—her own delay undermines any claim of urgency, and the harms she alleges (loss of NIL value, professional exposure, and competitive momentum) are either speculative, monetary, or equally applicable to another eligible player who will necessarily lose a roster spot if relief is granted. Additionally, the balance of equities does not favor Plaintiff. Disrupting the status quo by reinstating Plaintiff's eligibility after her participation in four seasons of competition would have ripple effects across NCAA Division I governance.

This ripple effect is not merely theoretical; it has been borne out by a wave of similar lawsuits over the past year challenging similar NCAA eligibility rules. The NCAA has prevailed in a substantial majority of these actions because the legal logic of the plaintiffs' position would undermine not just the specific eligibility rules in issue but, rather, the core concept of eligibility itself. If a player's ineligibility to play NCAA sports is sufficient to state an antitrust claim due to (even speculative) loss of NIL money or professional exposure, then every player who becomes ineligible under any NCAA rule can sue to invalidate it and obtain reinstatement.

Because governing law forecloses Plaintiff's antitrust claims, the NCAA respectfully requests that the Court deny Plaintiff's Motion.

## FACTUAL BACKGROUND

### I.      The NCAA and Its Eligibility Rules

The NCAA is a voluntary, self-governing association of over 1,000 member schools. Declaration of Jerry Vaughn (Vaughn Decl.), ¶ 5. NCAA member schools have adopted eligibility rules to ensure fair competition and enhance the product of collegiate sports. *Id*. ¶ 6. These rules are designed to maintain a balance between academics and athletics for college athletes, to ensure that new student-athletes have the opportunity to experience collegiate sports, and to ensure that college sporting events continue to attract fans. *Id*.

In Division I, the "Five-Year Rule," memorialized in NCAA Division I Bylaws 12.6 and 12.6.1, limits student-athletes to four seasons of competition (what Plaintiff refers to as the "Four-Seasons Rule") within a five-year period of eligibility that begins with their full-time enrollment.[1] Vaughn Decl. Ex. B. Legislated exceptions allow student-athletes meeting certain conditions to seek a waiver for a fifth season of competition. Pertinent here is the waiver under Bylaw 12.6.6 ("Season-of-Competition Waiver–Competition While Eligible"), which states that a student-athlete "may be granted an additional season of competition by the Committee on Student-Athlete Reinstatement in a case in which the student-athlete participated in a limited amount of competition while eligible due to a coach's documented misunderstanding of the legislation or other extenuating circumstances." *Id*. Such circumstances include, but are not limited to, a family member's life-threatening illness or extreme financial difficulties. *See id*., Bylaw 12.6.6.2. In addition, such waiver may only be granted if the student-athlete's participation took place during the first half of the season, and if they played 30 percent or fewer games that season. *See id.*, Bylaw 12.6.6.2.1. Further, even in cases where a student-athlete does not meet the aforementioned criteria, "the Committee on Student-Athlete Reinstatement shall have authority to review and grant a waiver based on additional documented extenuating circumstances." *See id.*, Bylaw 12.6.6.

## II.  <u>Plaintiff Competed in Four Seasons of Competition Before Applying for a Waiver to Compete in a Fifth Season.</u>

Plaintiff began her basketball career at Pepperdine University, where she played in two seasons of competition, during the 2021-22 and 2022-23 seasons, as a starting guard. Compl. ¶¶ 7–8. After completing her second season of competition, Plaintiff transferred to the University of

---

[1] Plaintiff refers to both the "Four-Seasons Rule" and the "Five-Year Rule," but her alleged injury (no longer being eligible to compete) is due to having exhausted her four seasons of competition under that component of the Five-Year Rule. Plaintiff has one year of eligibility remaining under her five-year "eligibility clock," so her reference to Bylaw 12.6.1.7, which is a way student-athletes may obtain a waiver/extension of their five-year eligibility clock, is irrelevant.

Miami ("UM") and participated in her third season of competition. *Id.* ¶¶ 10-12.

During this third season of competition at UM, Plaintiff allegedly encountered stressful team dynamics and began seeing Dr. Eric Goldstein, UM's Director of Sport Psychology and Mental Health, for treatment of her mental health. *Id*. ¶¶ 10, 13–18. In late November 2023, after exhibiting symptoms of depressive and adjustment disorders, *id.* ¶¶ 17-20, Plaintiff raised the possibility of "redshirting" with Dr. Goldstein. Vaughn Decl., Ex. D at 35.

On November 24, 2023, Plaintiff allegedly approached head coach Katie Meier ("Coach Meier"), "presented Dr. Goldstein's mental health diagnosis," and "formally requested to be redshirted" for the 2023-24 season. Compl. ¶ 21. This allegation is imprecise in three key respects. First, despite stating she made a "formal" request, Plaintiff did not submit anything in writing to Coach Meier or anyone else at any time. Second, the notion of requesting a "redshirt" from a coach is a misnomer. *See* Vaughn Decl., ¶ 24 and Ex. D at 39. Plaintiff's point, instead, appears to be that had she stopped playing for the rest of the season as of November 24, UM could have sought a "hardship" waiver under Bylaw 12.6.4—sometimes referred to as a "medical redshirt." A hardship waiver is potentially available to students who experience "incapacitating injury or illness" and who compete in less than 30 percent of the season, with supporting medical documentation. *See id*., ¶ 24 and Ex. B. Third, and relatedly, the waiver record before the NCAA confirms that UM was neither made aware of any diagnosis nor did Dr. Goldstein determine that Plaintiff was unfit to participate, such that Coach Meier did not agree to stop playing Plaintiff. Conversely, had the medical provider, Dr. Goldstein, determined that Plaintiff's condition rendered her medically unable to participate, the coaching staff would have been notified and Plaintiff would not have played. *Id*., ¶ 24 and Ex. D at 39. That did not happen; Plaintiff "was medically cleared for competition throughout the entire season," *id*., and she proceeded to play in

another twenty-two games that season, including the conference championship game. *Id*. at 3.

Plaintiff then transferred to the University of Central Florida, where she competed in her fourth season of competition. Compl. ¶¶ 26–28. Despite having ***exhausted*** her four seasons at that juncture, Plaintiff transferred to Utah Valley University ("UVU") in the hopes of competing in a fifth season of competition during the 2025-26 season. Compl. ¶¶ 28–29.

### III.   After Plaintiff's Waiver Request Is Denied, She Files Suit.

On August 4, 2025, UVU submitted a request to the NCAA on Plaintiff's behalf, seeking a season-of-competition waiver under Bylaw 12.6.6 ("Season of Competition Waiver—Competition While Eligible") based on "extenuating circumstances" during her third season of competition at UM.[2] Vaughn Decl. ¶ 17. The NCAA fully considered the waiver request in accordance with its regular practice, including seeking additional information from UVU and UM. *Id.*, ¶ 19. Among other things, the NCAA considered a detailed letter from UVU's Compliance Department; letters from Plaintiff, her father, and her UM roommate; text messages between Plaintiff and her UM teammates; and a treatment summary from Dr. Goldstein, noting Plaintiff's diagnoses of "Major depressive disorder, single episode, moderate (F32.1)" and "Adjustment Disorder with Anxiety and Depression (DSM-5 code F43.2)."[3] *Id.*, ¶ 19; *see generally id.*, Ex. D.

---

[2] Notably, no "hardship waiver" was sought under Bylaw 12.6.4 (despite it being mentioned throughout Plaintiff's Complaint and Memorandum). Plaintiff's papers also mention Bylaw 12.6.1.7.1.1, which addresses "incapacitating physical or mental circumstances," but that Bylaw addresses potential waivers of a student-athlete's five-year eligibility clock, not their permitted four seasons of competition. *See* Compl. ¶ 35. Plaintiff never applied for a waiver under Bylaw 12.6.1.7.1.1 (indeed, she has eligibility remaining on her five-year clock).

[3] DSM-5 code F32.1 means a single depressive episode characterized by a persistent low mood or loss of interest, along with other symptoms that are more severe than a mild episode but do not meet the criteria for a severe episode. *See* AMERICAN PSYCHOLOGICAL ASSOCIATION, Diagnostic and statistical manual of mental disorders (5th ed., text rev. 2022). DSM-5 code F43.2 is used when a person experiences marked distress and impairment that is out of proportion to the stressor, but the symptoms do not meet the criteria for another mental disorder. *See id*.

The NCAA followed up with a request for more information, prompting Dr. Goldstein to clarify that it was ***Plaintiff*** (not him) who raised the idea of redshirting and that "he did not share any mental health information with the coaching staff." *Id.*, Ex. D at 36. Likewise, UM confirmed that Dr. Goldstein never determined that Plaintiff was unable to participate in practice or competition, and that she was, in fact, "medically cleared for competition throughout the entire season." *Id.*, ¶ 24 and Ex. D at 39.

The NCAA denied the waiver request on September 26, 2025, explaining that Plaintiff's participation exceeded the "30% legislated limit by 16 contests" and she "participated during the second half of the season, including postseason" competition. *Id.* at 3. The denial also stated that UVU "was unable to provide objective documentation satisfying any of the legislated exceptions or other extenuating circumstances which would enable staff to provide relief consistent with the intent of the legislation." *Id.* UVU appealed the denial on October 14, 2025 to the Committee on Student-Athlete Reinstatement, which is composed of five members from Division I member institutions or conferences and one student-athlete representative. Vaughn Decl., ¶ 20. After considering the "totality of the information provided"—and the absence of any precedent for granting an appeal under Plaintiff's circumstances—the Committee denied the appeal on October 31, 2025. *Id.*, ¶ 22.

Plaintiff filed this antitrust action on November 4, 2025. *See* Compl. She alleges (1) violation of Section 1 of the Sherman Act (15 U.S.C. § 1); (2) violation of the Florida Antitrust Act, Fla. Stat. § 542.18; and (3) negligent infliction of emotional distress ("NIED"). She seeks injunctive relief, however, based only on her two antitrust claims, which are governed by the same

framework.[4] *See* Plaintiff's Memorandum in Support of Expedited Motion ("Memo") at 12; *All Care Nursing Serv., Inc. v. High Tech Staffing Serv., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law.").

## ARGUMENT

### I.    Legal Standard

Temporary restraining orders and preliminary injunctions are "extraordinary remed[ies]." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). The plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  The plaintiff must "clearly establish the burden of persuasion as to each of the four prerequisites," *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (cleaned up), and courts "uniformly require[] a finding of substantial likelihood of success on the merits before injunctive relief may be provided," *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001). When an injunction does more than preserve the status quo, as here, an even stronger showing is required. *See, e.g.*, *OM Group, Inc. v. Mooney*, No. 2:05-CV-546-FTM-22-SPC, 2006 WL 68791, at *8 (M.D. Fla. Jan. 11, 2006) (noting "there is a particularly heavy burden of persuasion on the moving party when it requests a mandatory injunction").

### II.    Plaintiff Cannot Show a Likelihood of Success on the Merits.

#### A.    The Plaintiff's Antitrust Claims Fail Because the Challenged Rules Are Not Subject to Antitrust Review.

The Sherman Act states "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is

---

[4] Plaintiff's NIED claim cannot succeed anyway because she has not alleged "physical injury caused by psychological trauma." *Diaz v. Miami-Dade Cnty.*, 424 F. Supp. 3d 1345, 1362 (S.D. Fla. 2019).

declared to be illegal." 15 U.S.C. § 1. "By its plain language, this section applies to [an NCAA rule] only if the rule is commercial in nature." *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 958 (6th Cir. 2004); *see also Freedom Watch Inc. v. Jud. Watch, Inc.*, 289 F. Supp. 3d 1270, 1274 (S.D. Fla. 2018).

Because the bylaws that Plaintiff seeks to enjoin are "true eligibility rules," not commercial rules affecting compensation and other benefits, the Sherman Act does not reach them. *See Goldstein v. NCAA*, No. 3:25-cv-27, 2025 WL 662809 (M.D. Ga., Feb. 28, 2025); *Giles v. NCAA*, No. 2:25-CV-06454-JVS-KES, 2025 WL 2551093, at *5 (C.D. Cal. Aug. 18, 2025); *Hasz v. NCAA*, No. 8:25CV398, 2025 WL 2083853, at *4 (D. Neb. July 24, 2025); *Johnson v.* NCAA, No. CV 25-60-M-KLD, 2025 WL 1790345, at *7-*10 (D. Mont. June 26, 2025); *Coley v. NCAA*, 792 F. Supp. 3d 634, 644 (E.D.N.C. 2025); *Osuna Sanchez v. NCAA*, No. 3:25-cv-62-CEA-DCP, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025); *Brzovic v. NCAA*, No. 2:25-cv-02885-DCN, 2025 WL 1370758, at *4 (D.S.C. May 11, 2025); *Gaines v. NCAA*, 746 F. Supp. 738, 743 (M.D. Tenn. 1990); *Jones v. NCAA*, 392 F. Supp. 295, 303 (D. Mass. 1975).

Plaintiff nevertheless invokes *NCAA v. Alston*, 594 U.S. 69 (2021) for the proposition that eligibility rules are commercial in nature. *See* Memo at 14. But the *Alston* court addressed rules restricting student-athlete compensation and benefits. 594 U.S. at 108 (Kavanaugh, J., concurring). As one court recently observed, "*Alston* eliminated rules that once limited compensation that student-athletes could receive in exchange for their athletic services," and that decision "concerned only a narrow subset of the NCAA's *compensation rules.*" *Goldstein*, 2025 WL 662809, at *3–4 (internal quotations omitted). *Alston* "didn't touch … 'true eligibility rules'" *Id.*, citing *O'Bannon v. NCAA*, 802 F.3d 1049, 1066 (9th Cir. 2015).

8

Several courts ruling differently on this issue have conflated the NCAA's commercial character with the purpose of its eligibility rules. *See, e.g., Zeigler v. NCAA*, No. 3:25-CV-226-KAC-JEM, 2025 WL 1671952, at *3 (E.D. Tenn. Jun. 12, 2025). As the Sixth Circuit explained in *Bassett v. NCAA*, however, the appropriate inquiry "is 'whether the rule itself is commercial, not whether the entity promulgating the rule is commercial.'" 528 F.3d 426, 433 (6th Cir. 2008) (quoting *Worldwide Basketball*, 388 F.3d at 959). The Court should end its analysis here, finding that Plaintiff cannot meet her burden to establish a substantial likelihood of success.

**B.   +Plaintiff Fails to Show a Likelihood of Success on the Merits Under the Rule of Reason**.

Even if the Court concludes that the challenged bylaws are subject to the Sherman Act, the antitrust claims still fail under the rule of the reason standard. *See generally Alston*, 594 U.S. 69; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express Co.*, 505 U.S. at 541–42. As such, the first step entails a fact-specific assessment of market structure, market power, and actual effects on competition to assess anticompetitive effects. *See id*. If the plaintiff carries this burden, the burden then shifts to the defendant to show a procompetitive rationale for the restraint. *See id*. If the defendant makes this showing, the burden then shifts back to the plaintiff "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id*. at 542. Here, Plaintiff's antitrust claims fail at every step – as a legal and evidentiary matter.[5]

**1.   Plaintiff Did Not Put Forth Any Evidence of Substantial Anticompetitive Effects in a Relevant Market.**

**i.   Plaintiff Does Not Adequately Define the Relevant Market.**

---

[5] In fact, the only materials Plaintiff submitted at all in this case are inadmissible as hearsay and attached to the declaration of her counsel. See Dkt. 15-1.

9

Pleading the relevant market is the first step in proving a Section 1 claim, because without it, "there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express Co.*, 585 U.S. at 543. The relevant market is the "area of effective competition," or the area where buyers and sellers can realistically turn to substitutes in what they consume or produce. *Id.* In the labor context, "the market is comprised of those employers seen by workers as reasonably good substitutes." *Fourqurean v. NCAA*, 143 F.4th 859, 869 (7th Cir. 2025).

Plaintiff alleges a broad labor market: NCAA Division I college sports.[6] *See* Compl. ¶¶ 54, 65; Memo at 14–15. Merely labeling the market, however, is not enough to survive a motion to dismiss, let alone satisfy Plaintiff's heavy burden on this motion. *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1098–99 (11th Cir. 2004) (for an injunction to issue, "a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6)").

The plaintiff must justify the proposed market "with reference to rule of reasonable interchangeability and cross-elasticity of demand." *Powers v. Health First, Inc.*, 2023 WL 10947153, at *6 (M.D. Fla. Sep. 7, 2023); *see also Jacobs v. Temper-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337 (11th Cir. 2010); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1552 (11th Cir. 1996). Absent any such reference, the "relevant market is legally insufficient and a motion to dismiss may be granted." *See Powers*, 2023 WL 10947153 at *6 (internal quotations omitted); *L.H. Equity Invs. LLC v. Wade*, No. 09-80607-CIV, 2010 WL 11505176, at *3 (S.D. Fla. Mar. 29, 2010). Plaintiff makes no attempt to rule out common-sense and potentially reasonable alternatives

---

[6] The Complaint also briefly references a "consumer market" for Division I sports. *See* Compl. ¶ 65. Beyond one sentence, Plaintiff does not discuss the consumer market at all. Given how undeveloped these allegations are, and Plaintiff's failure to tie the "consumer market" to any alleged anticompetitive effects, the Court should disregard this market for purposes of this motion. Accordingly, Defendant addresses only Plaintiff's alleged labor market.

10

where she could offer her athletic services, stating merely that "no comparable alternatives exist for elite collegiate competition." Memo at 14.

This conclusory allegation ignores numerous other avenues available to college-aged athletes, including, for example, (1) programs at schools in NCAA Division II and Division III, or in other intercollegiate athletics associations like the National Association of Intercollegiate Athletics or National Junior College Athletic Association, and (2) professional sports leagues like the WNBA in the U.S., as well as other international leagues. At a minimum, Plaintiff undermines the plausibility of her proposed market by failing to explain why these options are not viable substitutes. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) (dismissing Sherman Act claim where "conclusional" market allegation "beg[ged] the question" and complaint "provide[d] no factual allegations of the cross-elasticity of demand or other indications of price sensitivity").

Defining the relevant market, moreover, "requires almost necessarily an expert assessment." *Goldstein*, 2025 WL 662809, at *5 (citation omitted); *Stenograph, LLC v. Advantage Software, Inc.*, No. 99-6685-CIV, 2006 WL 8433176 (S.D. Fla. Nov. 30, 2006) ("11th Circuit law require[s] an expert to establish the relevant market"). Plaintiff offers neither expert testimony nor any supporting evidence to substantiate the alleged market. Faced with the same deficiencies in *Goldstein*, the court denied relief. *See id.*, 2025 WL 662809, at *5 ("Goldstein provided nothing by way of expert testimony or evidence to define the relative market.").

To the extent Plaintiff suggests that *Alston*'s definition of a relevant market should be adopted wholesale, that argument fails. First, *Alston* confined the relevant market to particular sports, *see* 594 U.S. at 81, rather than the entirety of Division I as alleged here. Second, *Alston* did not actually decide the relevant market; the issue was "uncontested." 594 U.S. at 86; *see also*

11

*Fourqurean*, 143 F.4th at 870–71 (explaining the same). Finally, *Alston* observed that the rule of reason analysis "generally requires a court to 'conduct a fact-specific assessment of market power and market structure' to assess a challenged restraint's 'actual effect on competition.'" 594 U.S. at 81 (quotation omitted). If *Alston* created new market realities, then *Alston*'s market definition (again, different than the one alleged here) cannot be adopted uncritically in new cases.

Plaintiff's reliance on the district court's decision in *Pavia v. NCAA* is similarly misplaced. 760 F. Supp. 3d 527 (M.D. Tenn. Dec. 18, 2024). Pavia, who played two years of football at a junior college before transferring to a Division I school, asserted that the relevant market was "college football athletes in general and NCAA Division I football specifically," *id.* at 539—not the entirety of Division I sports.[7] After the district court granted injunctive relief, the NCAA appealed. That appeal was dismissed on mootness grounds, but Judge Thapar observed in concurrence that Pavia had not "introduce[d] substantial economic evidence defining the boundaries of th[e] [relevant] markets." 154 F.4th 407, 416 (6th Cir. 2025). Plaintiff's relevant market allegations fail for the same reason.

### ii.   Plaintiff Does Not Adequately Plead Anticompetitive Effects.

Even assuming the relevant labor market has been defined, the plaintiff still bears the burden of proving substantial anticompetitive effects.  This is "no slight burden." *Alston*, 594 U.S. at 97. Indeed, "courts have disposed of nearly all rule of reason cases in the last 45 years on the ground that the plaintiff failed to show a substantial anticompetitive effect"—in fact, "courts decided 90% (809 of 897) on this ground." *Id.*

To show anticompetitive effects, the plaintiff must point to actual evidence of harm to

---

[7] In *Ohio v. NCAA*—another case cited by Plaintiff—the court likewise found the relevant market to be sport-specific. *See* 706 F. Supp. 3d 583, 592 (N.D. W.Va. Dec. 13, 2023). Defendant emphasizes this not to concede that any individual Division I sport constitutes a relevant market, but to demonstrate that Plaintiff's own authorities are inapposite.

competition. *See Am. Express*, 585 U.S. at 542; *see also Tempur-Pedic Int'l, Inc.*, 626 F.3d at 1339 ("The plaintiff has the burden of demonstrating damage to competition with specific factual allegations."); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1079 (11th Cir. 2004) (dismissing antitrust claim based on "vague" statements unsupported by "specific factual allegations to support the likelihood of any of this happening"); *Ragner Tech. Corp. Berardi*, No. 14-80734-CIV, 2015 WL 11393828, at *4 (S.D. Fla. June 12, 2015) (dismissing antitrust claim where "there are no factual allegations specifically addressing how this conduct has harmed competition in the market"); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084–85 (11th Cir. 2016) (affirming summary judgment for the defendant where there was "no evidence of an actual reduction in output, or increase in price, or deterioration in quality").

Plaintiff points to no evidence showing that the challenged bylaws harm competition, by way of expert testimony or otherwise. Instead, Plaintiff alleges in purely generic terms that the rules "suppress[] athlete mobility, reduce[] available output, and restrain[] trade," thereby "depriving athletes, like Plaintiff, of opportunities for competition, exposure, and NIL compensation." Compl. ¶ 64. By asking the Court to simply *assume* these anticompetitive effects, Plaintiff falls far short of demonstrating that she is likely to succeed on the merits of her claims.

Viewed through the lens of common sense and basic economic principles, moreover, Plaintiff's alleged anticompetitive effects do not hold up. For example, even if the challenged bylaws "restrict" participation, that decrease in "supply" should cause student-athlete compensation to ***increase***. *See* Compl. ¶¶ 59, 64; *Fourqurean*, 143 F.4th at 870–71 ("Under ordinary principles of supply and demand, a restraint that limits the supply of workers in a labor market would increase, not decrease, worker compensation."); *Arbolida v. NCAA*, No. 25-2079-JWB, 2025 WL 579830, at *3 (D. Kan. Feb. 21, 2025) (concluding that the current eligibility rules

"limit the total potential supply" but "seem to increase competition among the NCAA member institutions . . . for the limited supply of potential labor").

The challenged bylaws, furthermore, appear to produce a "near-net-zero effect at a market level." *Johnson v. NCAA*, No. 2:25-CV-01288, 2025 WL 3145866, at *4 (S.D. Oh. Nov. 11, 2025). Because there are "finite roster spots, granting Plaintiff's extraordinary remedy would have the necessary effect of excluding another eligible player" from the basketball court and corresponding NIL and professional opportunities. *Id.*; *see also Zeigler*, 2025 WL 1671952 at *4 ("Plaintiff has not shown that Defendant's limit on the labor side of the market—replacing one Division I basketball player with another—produces substantial anticompetitive effects.").

Plaintiff otherwise attempts to rely on *Alston's* discussion of harm to competition. But, as with the relevant market, *Alston* did not actually decide the issue of competitive harm because on the facts of that case, the court found it was not in dispute. *See id.*, 594 U.S. at 90.

At most, Plaintiff's factual allegations suggest that the NCAA's rules cause harm to **her**. But personal circumstances, standing alone, do not establish market-wide harm.[8] *See Spanish Broad.*, 376 F.3d at 1071-72 (affirming dismissal of Section 1 claim because "anticompetitive effects are measured by their impact on the market rather than by their impact on [individuals]"). As the Seventh Circuit put the point in *Fourqurean*, "[the student-athlete] relies solely on his own exclusion from participating in college football as proof of anticompetitive effects. He is not a rival of the NCAA, and he has not drawn a link from his exclusion to an adverse effect on an existing or potential rival of the NCAA." 143 F.4th at 870.

---

[8] This is also why, to the extent Plaintiff implies that the bylaws were misapplied to **her**—arbitrarily or otherwise—her claim is not cognizable under antitrust law. The Sherman Act is not a vehicle for individual fairness assessments. Nor has Plaintiff identified any other cause of action or legally protected interest related to fairness in athletic endeavors that would entitle her to declaratory or injunctive relief.

### 2. The NCAA Offers Procompetitive Justifications.

At step two of the rule-of-reason analysis, the defendant must demonstrate that challenged bylaws are supported by substantial procompetitive effects. Defendant satisfies that burden here.

The Four-Seasons Rule and waiver provisions under Bylaw 12.6.6 are procompetitive. First, they preserve college athletics as a unique offering from professional sports. Vaughn Decl. ¶¶ 6, 10. Numerous courts have acknowledged the validity of this purpose. *See*, *e.g.*, *Boyd v. NCAA*, No. 3:25-CV-00729, 2025 WL 2432200, at *7 (M.D. Tenn. Aug. 22, 2025) (endorsing the NCAA's rationales of enhancing output by creating opportunities for "high school senior student-athletes," preserving college sports "as a product distinct from professional athletics," and fostering "better alignment between Division I athletics and academics"); *see also* Statement of Interest of the United States at 8–9, *Zeigler v. NCAA*, No. 3:25-cv-226-KAC-JEM, ECF 28 (E.D. Tenn. June 12, 2025) ("USA Zeigler Amicus") ("And eligibility rules—like the scholarship rules upheld in the *Alston* litigation—not only can enhance consumer demand—potentially leading to greater compensation—but also can enhance quality in the labor market by preserving 'the distinction between college sports and professional sports.'" (quoting *Alston*, 594 U.S. at 84)).

The bylaws are further motivated by the concept that the length of time that the student participates in college athletics should bear a relationship to the four years generally needed to earn a baccalaureate degree at an NCAA member institution. Vaughn Decl. ¶ 10. Courts have likewise approved this rationale as procompetitive. *See, e.g.*, *Johnson v. NCAA*, No. CV 25-60-M-KLD, 2025 WL 1790345, at *15 (D. Mont. June 26, 2025).

Plaintiff's cited cases pertain to transfer rules and compensation rules and are therefore inapposite to her claim that the Four-Seasons Rule lacks procompetitive justifications. *See* Memo at 17 (citing *Johnson v. NCAA*, 108 F.4th 163, 181 (3d Cir. 2024) and *Ohio v. NCAA*, 706 F. Supp. 3d 583 (N.D.W. Va. 2023) (transfer bylaws)); *In re NCAA Athletic Grant-in-Aid Cap Antitrust*

*Litig.*, 375 F. Supp. 3d 1058 (N.D. Cal. 2019), aff'd, 958 F.3d 1239 (9th Cir. 2020), aff'd sub nom.

*Alston*, 594 U.S. 69 (2021) (compensation bylaws)). *Pavia*, too, is inapposite (and a non-binding

decision that has been disagreed with by many courts) because it considered the eligibility rules as

applied to junior college athletes. *See id.*, 760 F. Supp. 3d at 541–42. Because Defendant has

offered procompetitive justifications for the Four-Seasons Rule, the burden shifts back to Plaintiff.

### 3.   Plaintiff's Proposed Less Restrictive Alternatives Miss the Mark.

At step three, the Court must consider whether less restrictive alternatives could achieve

the NCAA's goals. The Court must keep in mind, however, *Alston*'s warning that the antitrust laws

are not a tool to routinely second-guess the NCAA's rules:

> [C]ourts should not second-guess degrees of reasonable necessity so that the
> lawfulness of conduct turns upon judgments of degrees of efficiency. That would
> be a recipe for disaster, for a skilled lawyer will have little difficulty imagining
> possible less restrictive alternatives to most joint arrangements. And judicial
> acceptance of such imaginings would risk interfering with the legitimate objectives
> at issue without adding that much to competition.

594 U.S. at 98 (cleaned up). Plaintiff has a heavy burden to show that the bylaws are "inexplicably

stricter than is necessary to achieve the procompetitive benefits." *Id*. at 101 (cleaned up).

Plaintiff's first proposed alternative—amending the waiver and/or "hardship-redshirt"

process so that it is "guided by independent medical and mental-health professionals," *see* Memo

at 19–20—would constitute precisely the sort of micromanagement contemplated by *Alston*.[9] *See*

*also Johnson*, 2025 WL 3145866, at *6 (waiver requests are "best considered" by the NCAA). The

court outlining the timing and scope of medical personnel's involvement in evaluating a waiver

request would open the door to endless procedural tinkering, with each future plaintiff demanding

---

[9] As noted above, when a medical provider determines that a student-athlete's condition renders
her medically unable to participate in practice or competition, **coaching staff is notified**. *See*
Vaughn Decl., Ex. D. Plaintiff here was "medically cleared" for the entire season. *Id.* at 40.

yet another incremental change—precisely the scenario *Alston* describes as a "recipe for disaster." *Id.*, 594 U.S. at 98; *Pavia*, 154 F.4th at 418 (Thapar, J., concurring) ("courts could become the *de facto* appeals body for eligibility determinations for over half a million student-athletes") (quotation omitted)).

Plaintiff's second proposal is to "allow athletes to compete in up to five full seasons."[10] Memo at 19. But whether the Four-Seasons Rule should be replaced with a Five-Seasons Rule is yet another "judgment[] [about] degrees of efficiency." *Alston*, 594 U.S. at 98. Once that door is opened, the next plaintiff will ask to play six seasons, then seven, then eight. The federal judiciary will be effectively tasked with rewriting the NCAA's bylaws.[11]

### C.      Plaintiff Has Not Suffered Antitrust Injury.

Rule-of-reason aside, Plaintiff has not suffered antitrust injury. This is not the same thing as injury-in-fact—antitrust injury must be the proximate result of the type of anticompetitive behavior the antitrust laws were designed to prevent. *See Brunswick Corp. v. Pueblo Bowl-OMat, Inc.*, 429 U.S. 477, 489 (1977). Plaintiff's alleged injury is individual in nature and resulted from the NCAA's denial of her season-of-competition waiver request. This is not the kind of injury contemplated by the Sherman Act. *See, e.g., BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, No. 02-

---

[10] To the extent Plaintiff seeks to permanently enjoin the NCAA from enforcing the Four-Seasons Rule, her claims are subject to the first-to-file rule and this court should decline jurisdiction and transfer this case, before ruling on the pending motion, to the Middle District of Tennessee, where Plaintiff would seemingly be a putative injunctive relief class member in *Patterson v. NCAA*, No. 3:25-cv-00994 (M.D. Tenn. Sep. 2, 2025). Defendant reserves all rights in this regard.

[11] Plaintiff's "Prayer for Relief" asks the Court to enjoin enforcement of the "Five-Year Rule." *See* Compl. p. 29, ¶ a. Defendant interprets this as an imprecise reference to what she has also called the "Four-Seasons Rule," since she claims injury only under that component of the "Five-Year Rule." If Plaintiff truly seeks to enjoin the five-year eligibility clock component of the Five-Year Rule, or "eligibility and waiver rules" in general, she lacks Article III standing. Plaintiff cannot compete in games this season because she has exhausted her four seasons of competition under Bylaw 12.6 and the related denial of her season-of-competition waiver request under Bylaw 12.6.6. Only those bylaws, therefore, are properly before the Court and capable of supporting standing.

17

60772-CIV, 2004 WL 7340356 (S.D. Fla. Mar. 16, 2004) ("The purpose of the antitrust laws are to protect competition, not individual competitors; therefore, the injury alleged must be to a market or to competition, not solely to an individual."); *Andela v. Univ. of Miami*, 692 F. Supp. 2d 1356, 1375 (S.D. Fla. 2010), aff'd in part, dismissed in part, 461 F. App'x 832 (11th Cir. 2012) (holding individual injury "couched … in the legalese of the Sherman Act" was not enough to establish antitrust standing).

Further, in suggesting that all student-athletes be capped at five seasons of competition, Plaintiff recognizes that some kind of eligibility limit is permissible under antitrust law. Thus, she takes issue not with the *existence* of an eligibility limit, but the precise *degree* of it. Determining the specific threshold for a Division I eligibility cap falls outside the scope of antitrust law.

### III. Plaintiff Cannot Satisfy the Other Requirements for a Temporary Restraining Order or Preliminary Injunction.

#### A. Plaintiff Will Not Suffer Immediate and Irreparable Harm.

Parties seeking interlocutory equitable relief must act quickly to secure their rights. *See Bensiek v. Lamone*, 585 U.S. 155, 158 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence."). Plaintiff's waiver request is premised on her 2023-24 season at UM—her third under the Four-Seasons Rule. Yet, even after transferring to UCF and facing her final season of competition, Plaintiff took no action to secure a waiver. It was not until well after the completion of her final season that she sought the instant waiver, on August 4, 2025—mere months before the start of the extra season she hopes to play. Moreover, Plaintiff did not file this antitrust suit until *after the 2025-26 season began*. *See Arbolida*, 2025 WL 579830, at *4 (denying motion where alleged injury was partly due to plaintiff's "own actions in waiting to file" and noting that "[t]here is no law that requires a plaintiff to exhaust the administrative remedies of the NCAA ... as a prerequisite to bring an antitrust suit" (internal quotations omitted)).

18

Setting Plaintiff's delay aside, she argues that "missing even a single game of NCAA competition constitutes irreparable harm," identifying one type of loss as "NIL value." Memo at 20–21. But to the extent Plaintiff's harm can be quantified in dollars and cents, it is not "irreparable" such that injunctive relief is warranted during the pendency of this case. *See Windsor v. United States*, 379 F. App'x 912, 916 (11th Cir. 2010) (noting "the possibility that adequate compensatory relief … will be available at a later date" indicates the harm is not irreparable).

Plaintiff's other alleged harms include loss of "exposure, team development, and competitive momentum." *See* Memo at 20–21.[12] Speculative nature of these harms aside, they can be "just as easily imputed to an eligible player who would be deprived the same opportunity if the Court were to grant Plaintiff's request for extraordinary relief." *Johnson*, 2025 WL 3145866, at *7 (citing *Zeigler*, 2025 WL 1671952, at *5 ("[G]iven the fixed number of roster spots available for each Division I basketball team, an injunction would run the risk of harming (1) currently-enrolled Division I basketball players who have already committed to a member institution and (2) current high school seniors who might have their college recruitment disrupted.")).

Plaintiff's final alleged irreparable harms, which are "emotional" and "psychological" in nature, *see* Memo at 21, are not cognizable as a basis for antitrust relief. *See Young v. Colonial Oil Co.*, 451 F. Supp. 360, 361 (M.D. Ga. 1978) (explaining that emotional distress to an individual is not a "business injury" as contemplated by the antitrust laws (*citing Hawaii v. Standard Oil Co.*,

---

[12] Plaintiff cites *Brooks v. State Coll.*, but in that Title IX case, plaintiffs sought to establish an athletics program such that their injury was the loss of competition in the first instance while they had remaining eligibility—not a bonus season of competition. 643 F. Supp. 499, 502 (M.D. Pa. 2022). Similarly, in *S.A. v. Sioux Falls Sch. Dist.*, the school district planned to eliminate its gymnastics program. *See* 2023 WL 6794207, at *1 (S.D. Oct. 13, 2023). *Sioux Falls* recognized that Title IX does not provide for monetary damages; "plaintiffs can receive either an injunction or nothing at all." *Id.* (internal quotations omitted). The third case cited by Plaintiff, *Ohio v. NCAA*, itself relied erroneously on *Sioux Falls*. *See* 706 F. Supp. 3d 583, 597 (N.D. W. Va. 2023).

19

405 U.S. 251 (1972) and 15 U.S.C.A. § 15)). In any event, Plaintiff's assertion that the denial of her Motion will "undo her psychological progress" is speculative. She offers no supporting statement from any medical provider. This is unsurprising, as Dr. Goldstein's prognosis for her mental health in 2023 was "[v]ery good with change in environment," Vaughn Decl., Ex. D at 35, and Plaintiff is now several environments removed from UM.

## B.  The Injunction Would Be Adverse to the Public Interest.

Plaintiff argues that the balance of the equities favors her position. *See* Memo at 22. In the same breath, she claims that she "seeks only to preserve the status quo." *Id.* But the status quo is one in which Plaintiff—having played four seasons of NCAA Division I basketball—has exhausted her playing time. Mandating that the NCAA reverse the status quo would create ripple effects far beyond Plaintiff's case. Although her claims may be unique in some respects, other athletes will follow her lead, pursue waivers, and—if such waivers are denied—file lawsuits to enjoin application of the Four-Seasons Rule. This would not only cause the NCAA significant institutional harm—hamstringing its ability to interpret and apply its membership's rules—but it will also solidify the judiciary's role as the *de facto* arbiter of eligibility-related waiver requests, in contravention of the Supreme Court's guidance in *Alston*. 594 US at 100–101.

This potential damage to the NCAA and college sports is not in the public interest. The Supreme Court has advised that "caution is key" when evaluating NCAA rules and that courts should be wary of intruding on "complex business arrangements" when considering injunctions. *Id*. at 91–92. Because Plaintiff has not made the "clear" showing necessary for mandatory injunctive relief, *Siegel*, 234 F.3d at 1176, her motion should be denied.

## <u>CONCLUSION</u>

For these reasons, Defendant requests that the Court deny Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

4925-8467-3402

Dated: November 21, 2025    Respectfully submitted,

            */s/ Vanessa Singh Johannes*
            Kate E. Gehl (WBN 1081421)
            Max S. Meckstroth (WBN 1101549)
            FOLEY & LARDNER LLP
            777 East Wisconsin Avenue
            Milwaukee, WI 53202-5306
            414.297.5279 (KEG)
            414.319.7022 (MSM)
            kgehl@foley.com
            mmeckstroth@foley.com

            Vanessa Singh Johannes (FBN 1028744)
            FOLEY & LARDNER LLP
            2 S Biscayne Blvd, Ste. 1900
            305.482.8412
            vanessa.johannes@foley.com

            *Attorneys for Defendant National Collegiate*
            *Athletic Association*

4925-8467-3402

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November, 2025, I electronically filed the foregoing document using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: November 21, 2025.


*/s/ Vanessa Singh Johannes*